Thank you, Your Honor. I'd like to reserve five minutes for rebuttal. The United States undoubtedly has a legitimate interest in cutting off funding for terrorist activities. But as the Supreme Court reminded us this summer in the enemy combatant decisions, the government sometimes overreaches in seeking to further its legitimate interests. This is one of those instances. As interpreted by the government, the material support statute turns human rights advocates into terrorist criminals based solely on the identity of their audience. It imposes criminal liability even where a defendant can prove that he had no intent to further any unlawful activity and that, in fact, his support did not, in fact, further any unlawful activity. And it gives the Secretary of State power to bar all support, even to groups that pose no threat to our national security, but as to which she finds that they merely undermine our economic interests. The government's legitimate interest in cutting off... But, counsel, are you challenging the authority of the Secretary of State to make these designations? And if so, by what standing do you assert to do that? We are challenging the statute both on its face and as applied. And one aspect of the challenge is that the statute gives a government official, in this instance the Secretary of State, unfettered discretion to designate virtually any of the tens of thousands of organizations around the world that have ever used or threatened to use a weapon as a proscribed group. So she can make it a crime for my clients to provide human rights advocacy of the PKK, but it's not a crime for my clients to provide human rights advocacy to the PLO or to the IRA. And that is a First Amendment issue. Are you saying that argument is a First or Fifth Amendment? That argument is both a First and Fifth Amendment challenge to what is essentially an unfettered licensing scheme that gives the Secretary of State the power to designate groups? Imagine if there were domestic... Where it's unfettered. As I recall, the scheme is that the Secretary makes a designation as part of an administrative process that the organization is free to contest. Congress can override the designation, and also the D.C. Circuit can override the designation, and, in fact, it has on occasion. Well, Congress, I don't think, can override the designation except by passing a law. There's a requirement. I don't think that's right. I think the Secretary has to submit the designation in advance to Congress. That's true, but it would be a charter problem if Congress could somehow negate it without passing legislation. All you're saying is the statute does provide for Congress to override it, but you think that part of the statute is unconstitutional? No, Judge Kleinfeld. I don't believe that the statute gives Congress the power to override it except by... In any case, on your unfettered point, you do concede that there is both an administrative process with the organization having an opportunity to challenge the designation and a review process by a court of appeals. That's right, but imagine this. Imagine a domestic statute that gave the Federal Election Commission the authority to designate particular political parties within the United States and based on simply finding that they engaged in some illegal activity at some point and that their activities undermine our national interests. Terrorist organizations have to be foreign. They're not in the United States. That's right, but for First and Fifth Amendment purposes, there is no distinction between foreign organizations and U.S. organizations with respect to criminalizing a U.S. citizen for their support. The Communist Party cases, which we rely upon, involved a foreign-dominated organization that Congress found... You're saying it's foreign-dominated. It has to be a foreign terrorist organization. An organization in Turkey or Iran or someplace is not entitled to the First Amendment protection because they're not in the United States. You're right, Judge Kleinfeld. They are not and we're not representing the organizations in Turkey or Iran or Sri Lanka. What we are representing are U.S. citizens here in the United States who unquestionably have First Amendment rights, unquestionably have Fifth Amendment rights. And as interpreted by the government, this statute violates the Fifth Amendment principle of personal guilt. Why? Because it imposes what is essentially a form of strict, vicarious criminal liability. That is... That's a different argument. That's a different argument that has to do with notice. I thought we were discussing the question of how you had said, and maybe you overstated and you want to rephrase what you said, but you said the Secretary has unfettered discretion to add... Or maybe I misunderstood what you said, that unfettered discretion to add organizations to the list of prohibited organizations. And as I understand your answer to Judge Kleinfeld's question, you concede that there is a process in law either to override it by statute or the organization can go to the Court of Appeals for the District of Columbia Circuit and challenge the designation. Now, how is that consistent with your characterization of this process as unfettered discretion? And why isn't this enough legal process to insulate the designation from any claim that somehow this is arbitrary or that somehow it is content-oriented? You know, they are bumping on the designations for their views or whatnot. Why isn't that process enough? Well, Judge Kuczynski, I don't want to spend too much time on the licensing issue because we have distinct First and Fifth Amendment arguments, particularly Fifth Amendment arguments which were not presented... That's where you started. If you want to... No, Your Honor, I started with... I will let you walk away from it. No, I'm not going to... I will simply let you know that you did not give a satisfactory answer to the question. Let me answer your question. What the D.C. Circuit has held is that the critical criterion, the criterion that distinguishes the thousands of organizations around the world that have ever used a weapon or threatened to use a weapon against person or property, which could be designated as terrorist organizations, from the 35 that are designated, is the Secretary of State's determination that in her discretion, unchecked by judicial review, because the Court has held that it is a political question that cannot be reviewed, that organization's activities are inconsistent with our foreign policy or our economic interests or our national defense. And all I was suggesting is that when the government seeks the legitimate interest of pursuing the stopping the funding of terrorist activity, it has to do so in a calibrated fashion. And when you give a government official literally unchecked power, because the courts have held we cannot question the Secretary of State's determination that the PKK activities undermine our economic interests, that is not a statute that is narrowly tailored to the legitimate interest of cutting off terrorist financing. Excuse me if I could just interrupt for one moment. I neglected to point out that Judge Gould is unable to be in Pasadena today, and he is with us on the telephone. Thank you. In addition, the new statute, which has not yet been enacted, been signed into law, but every indication will be, has yet another layer of licensing authority with respect to personnel, expert advice and assistance, and training, giving the Secretary of State literally unchecked discretion to deny or grant approval in essentially a prior restraint licensing scheme to those who seek to provide personnel training or expert advice or assistance. So groups like the PKK and the Tamil Tigers can challenge the designation, can't they? They can. Although, as I suggested, the D.C. Circuit has held that the critical criteria, the only criteria that really distinguishes the thousands of organizations in the world that might be designated from the 35 that are, is unreviewable. So for all practical purposes, they can't challenge the critical element. They're doing the same thing. I'm sure, in fact, I know that some of these organizations have challenged the designation. Aren't they in the best position to challenge the designation and make the kind of arguments you're making right now? They are in the best position to challenge their own designation, but our clients are facing criminal prosecution if they continue to provide human rights advocacy training and peacemaking training to the PKK. Counsel, it seems to me you're mixing two things when you talk about the untrammeled designation. You just conceded to Judge Wardlaw that an organization that is designated has a full right to challenge. And what's more, some of those challenges have conceded. The D.C. Circuit has vacated at least one designation that I recall. What you are challenging is you say there must be thousands more terrorist organizations that are not designated because the Secretary of State has not decided that U.S. policy requires a designation. So what you're saying is there's not unchecked discretion for designating an organization. There's just unchecked discretion for not designating one. But I can't see where your clients or anyone else except the victims of the other organizations who are not suing here are harmed by the Secretary's unchecked discretion not to designate an organization. Well, Your Honor, again, I think that the significance is this. If my clients want to provide human rights advocacy training to the PLO, they have every right to do so. But if my clients want to provide human rights advocacy training to the PKK, they have no right to do so and they will spend 15 years in prison for doing so, even if they show that their support neither was intended to further that group's illegal activity nor had the effect of furthering. And that, it seems to me, poses problems under the Fifth Amendment, which I'd like to turn to in a moment, and the First Amendment. But on the First Amendment prong, certainly... Well, it sounds a little bit more like a selective prosecution argument. That is that there are a lot more opportunities that the government has to have designated organizations and prosecuted other people, but it hasn't done that. No, Your Honor, it is essentially a content discrimination argument. It's one thing to impose a kind of across-the-board limit on contributions, as the campaign finance law does, to all political parties. It would be very different if the FEC had the power to say, well, you can give to the Democratic Party and you can give to the Republican Party, but you can't give to the Green Party. That would be a First Amendment, and someone who wanted to give money to the Green Party could challenge that on First Amendment grounds as content discrimination because it discriminates based on the identity of the group. This statute also discriminates based on the identity of the group. And again, the difference is a political one. There's no difference between the activities of the PLO and the activities of the PKK. The difference is that we've made a political judgment that one group we're going to allow unlimited support to and another group we're not going to allow. Does it make any difference that these organizations are not political parties? Well, these organizations are political parties. They also engage in illegal activity, just as the Communist Party was a political party that engaged in illegal activity, was found by Congress to have engaged in terrorism, just as the NAACP is a political organization but engaged in illegal activity. Operation Rescue and the American Coalition for Life Act, this is what they're doing. They're seeking elective office in this country. No, but the First Amendment rights association is not limited to supporting groups that are seeking elective office in this country. Let me turn to the Fifth Amendment. It seems like you're depending on a lot of mixing together of things that are separate. None of these organizations are American political organizations. Also, what's being interfered with is not the right to speak. You can freely speak. Anyone can freely speak in favor of whatever terrorist activities the Tamil Tigers engage in. They can say, I think the Tamil Tigers are right to engage in this terrorism. All that's prohibited is giving material support or resources to foreign organizations. It seems odd to me to say it's constitutionally permissible to limit the material resources that an American can give to an American political party, but it is unconstitutional to limit the material support that somebody in the United States can give to a foreign terrorist organization. It seems to me you can only make an issue of it by confusing. I don't think it's confusing. I think the proper analogy would be to a domestic campaign finance statute that did not treat all parties equally, but treated different parties differently. That I don't think would be upheld under any, I don't think one judge on the Supreme Court would. You would also say then that if, say, we were at war with Nazi Germany, but we were not at war with England, that it would be unconstitutional for the President to limit material support for Nazi Germany, but permit material support for England. No, I think that's distinguishable on two grounds. First, in wartime, there are special authorities. And I think, for example, that it would be permissible for Congress to forbid all support to Al-Qaeda, because we have declared war on Al-Qaeda. Congress has authorized the use of military force against Al-Qaeda. I think it would be perfectly permissible, just as it's permissible in wartime, to criminalize any support to the country against which we are fighting. I think in peacetime, the federal government cannot pick and choose which countries or foreign movements or foreign terrorist organizations are helpful to U.S. interests and which are harmful and prohibit support to the foreign terrorist organizations. Certainly not when it does so as broadly as here. I think there are certainly options. Congress can use civil authority to target organizations that are engaged in terrorism, freeze their assets, bar them from doing business here. Congress can prosecute any individual who supports a designated terrorist organization. When you say bar them from doing business here, that's just what the statute does. You can't give material support. No, what this statute does, Your Honor, is to put Judge Ralph Ferdig in jail for 15 years if he provides human rights advocacy training to a group in Turkey. It doesn't target the group in Turkey. It targets Judge Ferdig. He's the one who's going to spend 15 years in jail even if he can prove that his support had no conceivable purpose of furthering terrorist activity and, in fact, had the effect of discouraging terrorist activity. Counselor, I'd like you to drop the other shoe. In response to Judge Kleinfeld's hypothetical, you said there are two bases for distinguishing his hypothetical. One was that it was wartime. What's the other? Well, the second distinction, I think, is that there is a constitutional distinction. I'm getting a lot of feedback here. There is a constitutional distinction between, as the Supreme Court recognized in Regan v. Wall, between embargoes on transactions with foreign nations and targeting political organizations. When a government puts an embargo on trade with Cuba or Great Britain, that's part of nation-to-nation diplomacy. If the government were to ban all donations to Amnesty International, a British organization, it wouldn't have the same authority, and it would trench on First Amendment rights. So I think that's another distinction. But with respect to a group like al-Qaeda, the distinction is more. Are there cases that say so? Yes. I think the Communist Party cases say so. I think the Communist Party cases, again, involve you have to go back, think back to when these. Where specifically? That's a very general sort of citation. Well, okay. I'm sorry. You're absolutely right. United States v. Scales. United States v. Scales, the Court was dealing with a foreign-dominated organization that Congress had found had engaged in terrorism, espionage and sabotage, had front groups and cells operating in the United States, and had the purpose of overthrowing the United States by force and violence. Nonetheless, the Court said that the Fifth Amendment principle of personal guilt, an argument which we didn't advance in H.L.P. 1, but did advance in H.L.P. 2, prohibits the imposition of liability on an individual based on his association with that group. And what the Court said was based on his status or conduct in connection with that group. Those cases didn't involve providing material support to the KGB and other organizations, did it? Judge Gould, no, they did not. But the. It's hard. There's a reverberation on the sound. Oh, I'm sorry. I thought it was. I'm sorry. Judge Beyer. There's a difference between association and providing material support, isn't there? I think there is not a difference with respect to the principle of vicarious criminal liability. The principle articulated in Scales, the Fifth Amendment principle. Let's put aside the First Amendment principle for a moment. The Fifth Amendment principle says that you have a right not to be criminally locked up for, based on your support or connection to some other, someone else's illegal activity unless you intend to further that other person's illegal activity. And the Court applied that in Scales to membership. But it's not limited to membership. In fact, as the Ferguson v. Estelle case from the Fifth Circuit has said, this requirement of shared illegal purpose is a requisite of all vicarious criminal liability statutes. And think of the statutes of conspiracy, of aiding and abetting, RICO, anti-gang statutes. These are all statutes that have gone to the limit of imposing criminal liability. And nonetheless, they're not. You're speaking so broadly. When you try to apply that Gale case, the principle there is there has to be some amount of personal conduct. It's not that personal conduct is violative of law at some times. But in this statute, you have personal conduct. The individual defendant has to provide material support to an organization that's on the list. Right. But nonetheless, under the amendment, he has to know it's on the list. Right. So he's got the scienter and the mens rea. So it appears to me that once you narrow down your discussion to a particular citation of a particular case, it's plainly irrelevant. Well, I don't think so, Your Honor. Because, again, what Scales held, it's not enough to have personal conduct in support of the Communist Party. Because that's what Scales was about. What the Court said was you have to have personal conduct that is intended to further the illegal activity. So in this Court's decision in Hellman, which followed Scales, you had someone who had solicited contributions to the Communist Party. And the Court said, nonetheless, you cannot criminally prosecute this individual even though the Communist Party is a foreign-dominated group backed by the second largest superpower in the world with the intent to overthrow the United States by force and violence. The Court drew the line and said the principle of personal guilt requires some showing of intent to further the illegal activity of the group. And that, as I said, that principle has been applied to RICO. It's been applied to conspiracy, aiding and abetting, and the like. And if you were to – But that's been found here in humanitarian law project number two, that you cannot expect a terrorist group to give an accounting of what funds it receives for charitable purposes and expect it not to use it for bombs. That's already been decided here. Are you asking us to overrule that? You are, aren't you? Our view is that the HLP2 panel correctly identified the Fifth Amendment principle at stake, but did not go far enough because it departed from Hellman, Brown, and Scales in finding that what was required in order to justify a Fifth Amendment violation is knowledge and intent. That's what the courts have held. And what the HLP2 panel said was knowledge only. Under our view, it's not enough. Imagine a statute – I mean, we wouldn't need RICO conspiracy and the like if the government could just designate groups as criminal and then prohibit all support to those groups irrespective of intent. The government wouldn't have to – you know, people wouldn't have to bring the cases against the American Coalition of Life Activists or Operation Rescue because the government could just designate them as criminal groups, prohibit all support, and then prosecute even those people who gave to Operation Rescue because they believe in its principles and don't believe in its illegal activities. But what the Supreme Court has said is that that's not permissible. And, you know, I go back to Claiborne Hardware, the case that this course relied on in American Coalition for Life Activists. In that case, the Supreme Court said you can't hold the leaders of the NAACP, who had engaged in very inflammatory speech in connection with a boycott they organized where there were serious injuries imposed. You couldn't hold the leaders responsible, yet under the theory that material support is different, Your Honor, you could hold the Ford Foundation liable for making a donation to the NAACP. That can't be right. Counsel, are you arguing that in this context money is equal to speech as it is in the Buckley context? Your Honor, this is a Fifth Amendment personal guilt argument, so it really doesn't turn on whether you treat it as speech or not. We also believe that under the First Amendment that there is not a meaningful distinction between material support and membership because, as the HLP1 panel suggested, because if you go back to one of your criminal analogies, if someone said, I'm really glad that the such-and-such gang robbed the bank, that's speech. But if they provide the getaway car or money to acquire a getaway car, that's conduct. And you would say that those are equivalent? No. I would say, Your Honor, that whether it's speech or conduct, you can't hold someone responsible for supporting the gang unless you show that they intended to further the gang's illegal activities. And that's, I think that's consistent with this Court's decision in McCoy versus Stewart. Do you think that if you provide the getaway car to the hole-in-the-wall gang that robbed the bank, the reason you provide the getaway car is that you think these boys can be redeemed? And if you can just get them away from the scene of the crime and talk to them, you'll redeem them and reform them. Then that can't be criminalized. Well, Your Honor, you can, you know, it would be a question for the jury whether the intent of providing the getaway car was a legitimate one or an illegitimate one. That's a question in all vicarious – Are you saying it's unconstitutional to criminalize it if the purpose of providing the getaway car was so that you could give these boys counseling? If the legitimate purpose – yeah, if the legitimate purpose was – now, if you were engaging in willful blindness to the aiding and abetting, then I think you could find that that was – If you provide the helmets, you say, look, I really don't believe in the activity they're engaged in, but when they crash those motorcycles, I don't want them to hurt their heads. I want them to be safe, you know, because they might, you know, kind of get away from the police. They might as well crash those helmets. So you say what I'm going to do is I'm going to buy helmets for them to have when they make the getaway from the police. I think – You couldn't criminalize that because you're just looking out for their welfare? I think that there are – again, I think that there are lines that can be drawn. That's what I asked you. Right. And I think if you are – it might be permissible, for example, for Congress to prohibit all support in the form of military equipment to designated terrorist organizations. But when you go so far as – Is that my question? Well, and your question with respect to the helmet, again, I suppose if you are – let's put it this way. Let's just say, though, that a helmet – you don't get stopped by the police. If there's a helmet law, then you don't get stopped by the police. It not only protects your head, but it helps you avoid detectives. Let me put it this way, Judge Kaczynski. If a mother of a gang member gave a helmet to her son for Christmas, and then that helmet was used in a getaway, I don't think she could be held responsible. You're changing my question. I don't think so. And you're changing my question by doing that. You're not answering my question. You're answering a different question. My question is, let's say you say, look, you boys are going off to rob a bank, and I know you're going to be riding a motorcycle, and I know motorcycle riding can be very dangerous. We happen to be in a state where it's not illegal to ride a motorcycle without a helmet, so we're not worried about you being stopped by the police. But I know when the police chase you, you are going to possibly crash and hurt your heads, and God forbid you should hurt your head. So I'm going to provide you helmets so you'll be safer while you're committing this bank robbery, which I disapprove of mightily. Yeah. You think the state can't say let's provide material support for a criminal activity? I think they could. So here's where we are. Here's where we are. You provide money for an organization whose purpose has been determined to be, and again, we discussed the question of how the determination is made, and I realize you dispute that, but you have to accept the purpose of this argument, that they have been determined to be terrorist organizations. Okay? So you're going to say, well, we're going to provide humanitarian aid, so when they get shot up and part of their terrorist organization, and they bring back the wounded from that, God forbid that they should bleed to death, or they should not have the best medicine, and we ought to patch them up together, because that's a humanitarian thing to do. You can't separate them. It's just like you can't separate the helmets from the getaway. I think you can, and I think under the Constitution you have to, because if you accepted that, then you would say that. Why can you do it domestically? Why can the state say you provide the helmet for the getaway, you are guilty of the crime, whereas if this happens abroad, isn't it exactly the same situation? No, because it depends on how the statute is written. Surely, if you provide support for the purpose of furthering some criminal activity, then you can be criminalized. But the mother, going back to my hypothetical, if you wrote the statute so broadly, that the mother who gives a gift of a helmet to her son is liable without any showing of intent whatsoever, and that's this statute. This statute makes the Humanitarian Law Project guilty, even if they have absolutely I'm not changing the hypo. I'm not accepting Judge Kaczynski's hypo. Your principal counsel goes so far that you would say harboring statutes are unconstitutional. No. No, I would not, because harboring requires Harboring would be for a nice motive. No, harboring And the crime has already occurred anyway. Harboring statutes also require some knowledge that the criminal activity was undertaken and that you are harboring the person, that is, hiding the person, facilitating knowledge that the organization to which material support is being provided is on the list. Right. And that's not enough. Just as you had the knowledge that the Communist Party The case says it's not enough. Again, scales, which has been applied across the board, not limited to membership cases, to all vicarious criminal acts. There is no such thing as strict Let me take a more specific example, which comes out of the statute, and it doesn't involve helmets or other things. In your view, if an American citizen provided weapons to one of these groups, would they need to provide those weapons with the intent that they be used for an illegal purpose, or would that be sufficient for a potential criminal conviction under the statute? I think that Congress could clearly make it a crime to provide weapons to these groups. They have. Yeah. So is your argument really not that you need the intent to use them illegally, but the things that they're asking to provide are either too vague or too overbroad? Is that really your argument? Well, I think, yeah. My argument, to go back to the beginning, is that there is a legitimate interest in cutting off terrorist funding, but you've got to do it through more narrowly calibrated ways. One narrowly calibrated way would be to identify those things which are particularly likely to further terrorist activity, like military weapons, helmets, what have you. Why does that make a difference? I mean, you can use weapons for non-terrorist purposes. Right? You can donate the weapons. You know, my intent is that they use it simply to guard against crime. You know, the areas they operate in are full of crime. There are brigands on the roads. And, you know, I give them the weapons just so they protect themselves and their families from brigandage. At the same time, money is weapons. Money in the international market can be turned into weapons in no time at all. There's no difference. It's easier to transport. You don't even need a suitcase. You can just send it electronically. It's like sending a weapon through the mail. Use your time, but you can answer the question briefly. I don't understand. I mean, you answered Judge McKeon's question, which describes me as a highly pertinent one. Why don't you then have to attach to giving of a weapon an intent to further criminal activity? As long as you say, oh, I only want them to use the weapons for legitimate purposes, that's okay. Right. Well, I think from a First Amendment standpoint, I don't believe that there's a First Amendment right to provide weapons to anybody. There is a First Amendment right to provide contributions to political organizations. Do you make a distinction for other purposes, whether you give dollars or a pound of gold? Yes. I think yes. Where is that distinction between the two? Because there is not one case which upholds the right to give weapons to a political organization, and there are a legion of cases from this Court and the Supreme Court that hold that the contribution of money to a political organization is constitutionally protected. You have used your time. Thank you. May it please the Court, I'm Douglas Letter from the United States Department of Justice, representing the defendants in this case. And as is clear from our briefs, we urge that the judgment of the court below be affirmed in part, but reversed in part. I want to spend most of my time addressing the new bill that Congress has passed and its effect on the training personnel points. But before I got to that, I very briefly wanted to respond to Professor Cole's points and some of the questions from this Court. Judge Wardlaw, you are correct. Organizations have challenged. In fact, the PKK itself, I'm sorry, the Tamil Tigers challenged their designation in the D.C. Circuit, and the D.C. Circuit upheld that designation. On the points that Professor Cole has raised, I'd particularly like to commend to this Court, I know it's not binding on you, but the D.C. Circuit decision written by Judge Mikva in the Palestine Information Office case, which is cited and heavily relied on in our brief. There, the State Department, in a clear foreign policy move, told the Palestine Liberation Organization that it had to shut down its mission in the United States. The ambassador for the PLO was an American citizen, and he said this violated his First Amendment rights to speak and represent the PLO. And Judge Mikva goes through what I think is a very careful analysis and addresses many of the types of questions and arguments that Professor Cole has made and rejects them and says that there is no First Amendment right to represent a foreign organization. And note, they were not representing a foreign government. This was an entity like the Tamil Tigers or the PLO. And Judge Mikva finds, going through an O'Brien analysis, that the Secretary of State can indeed make these decisions, which makes perfect sense. Professor Cole's argument is breathtaking in scope. As we know, the Secretary of State, the President, can impose an embargo on trade with Cuba, but not Jamaica. They're both Caribbean nations. Obviously, we can draw distinctions. Professor Cole's response to that is, ah, but those are governments. That should make no difference. The PLO was not a government. The Taliban was not a recognized government. The United States never recognized it as a legitimate government of Afghanistan. Clearly, the Secretary of State and the President can draw these types of distinctions in the foreign affairs realm. What is your response? I'm sorry. What is your response to counsel's argument that the best parallel is to the Communist Party cases in which, by today's terms, it would have been called a terrorist organization, and yet support, both verbal and to some extent material, was not considered to be sufficient for criminal liability? Your Honor, you'll be very surprised to learn that I disagree strongly with Professor Cole on that. I knew you would be. You still disagree. I disagree. I remember last time you disagreed. I disagreed then, too. Yes, Your Honor. The difference is, in the Communist Party cases, as we've pointed out, not a single one of those cases involved provision of material support. Scales, for example, as Professor Cole, I think, honestly said to you, involved membership in the Communist Party. Doesn't that usually come with some dues paying? It certainly could, Your Honor. And if that had been part of the Supreme Court's discussion, Scales, I would have a much more difficult argument today. The Supreme Court did not address that because it was not involved. The question was, was Mr. Scales an active member of the Communist Party? And so not a single one of the cases that Professor Cole has cited is on point here. What we think the cases that are on point are the cases like the Palestine Information Office or Regan v. Wald, where the executive branch has placed an embargo on all dealings with certain foreign entities. So, for example, for much of the time, if you wanted to provide aid to dissidents in Cuba, you said, I want to provide cash so that they can oppose the Castro regime. That's my intent. I can prove that I'm going to hand the money to the dissident. That is against the embargo and clearly would be upheld under the various statutes. What is the distinction where we'll allow dissidents but not supporters of the government? What is the distinction where drawn along ideological lines, as I think opposing counsel has suggested? You know, the PKK and the PLO are not that different in the minds of many people. They both commit terror acts. You know, they operate in somewhat different parts of the world. And the argument is the distinction between the two is based on ideology. That is the argument. And what do you do with that? Again, I strongly disagree with Professor Cole. The president can draw distinctions on ideology. And, for example, if we could go back to Judge Kleinfeld's hypothetical, but let's make it a little earlier, not during the war. Let's make it 1936. If Professor Cole is right, President Roosevelt could not have said, I am hereby placing an embargo on all dealings with the Nazi party. Professor Cole would say, you can't do that unless you also bar dealings with the British Labour Party. Because that's a content-based discrimination. Yes, it's content-based. I think the members of this court should not be surprised to hear that the executive branch in foreign relations can draw content-based lines that are not limited to dealings with foreign governments. It's a little bit to say that they can draw a distinction in foreign relations. Let's twist the point around a few degrees. Because the question is not, can we choose to recognize one government or one organization or whatever? Can our State Department, in its own dealings with these various entities, governmental and quasi-governmental, can it choose to recognize some and fail to recognize others based on ideology? Clearly it can. That's why we pay the Secretary of State such a handsome salary to have the President decide which ones are good for America and which ones are not good for America. That's the whole point. But here it's a somewhat different issue. Because we are dealing with U.S. citizens and the expression of their views in a domestic context. And let's say that the government said, you know, all organizations that promote are in the world we've looked through, and there are many organizations in the world, and there are some that promote free enterprise, the American way, capitalism, you know, all those things that we like. And as to those things, Americans can give freely. But there are other organizations, and they don't engage in terrorism, I think, but they promote a philosophy that we as a people despise socialism, communism, you know, the list of despise, you know, things that are the un-American way. And what we're going to do is we're going to divide organizations of the world into those two groups, and those lucky enough to be sort of espoused in the American way, Americans can give freely, send money, whatever. But those other organizations, and again, not terrorist organizations, simply organizations that espouse the wrong view, you can't give money to us as an American. You can't do it because we think that's not in the Americans, in our best interest. Okay? Is that a distinction that our government can draw legitimately, consistent with the First Amendment? Yes, Your Honor. Obviously, your hypothetical is more difficult than this case, but yes. I tried to make it more difficult because I've eliminated the terrorism business, which is obviously an important factor. Just focusing on pure ideology. Yes. And your answer is yes. Our government could choose to limit, prohibit contributions by U.S. citizens to organizations because our president and our State Department thinks that they are un-American. Yes. So, for example, the German Nazi Party in 1932, as it was getting going, before Hitler took power. That's one example, but how about they decide, well, you know, the Nobel Committee has been sort of pink lately. We just don't think that they are a very good group, and therefore we don't think U.S. citizens should be contributing because, look, they've given the Nobel Peace Prize to all sorts of people that we think shouldn't get it because we disagree with their ideology. Let's say that somehow the Nobel Committee makes its way on it. Now, I realize they don't need our money, but presumably they do accept contributions. Your Honor, the case that I would point you to is Kleinings v. Mandel. There, Professor Mandel was a Belgian professor, a Marxist, who wanted to come into the United States to meet with U.S. citizens. The court obviously, and the United States government said no. The court obviously easily dealt with his claims. He has no constitutional rights and, therefore, had no claims. But there were no claims on listeners. Exactly. Then that was the key part of the decision. And the Supreme Court there said that as long as the government had a facially legitimate reason, that it could keep Professor Mandel out of the United States, and that meant that U.S. citizens could not associate with him. But the Supreme Court said a facially legitimate reason was sufficient. And, obviously, it's because we're dealing with this foreign affairs realm where the political branches are supreme. And, indeed, the Supreme Court, the D.C. Circuit, and I believe this Court, too, has said that in the foreign affairs realm the delegations from the Congress to the President can be much broader than they would be in the domestic realm. Because, again, this is an area where we as a people entrust to the political branches. I'd like to move on. Oh, I'm sorry. One last point. Professor Cole was saying weapons, no, but other things, yes. I would just like to point out the USS Cole was attacked, and U.S. sailors were killed by a dinghy that came up to it and blew a hole in the side. Truck bombs in Lebanon, et cetera. Trucks. So Professor Cole has to go way, if he's going to draw lines, he, I think, has to go way beyond weapons to include cars, trucks, dinghies, virtually everything you can think of that could be used by a terrorist organization. And the last point is, remember, we are dealing with organizations like the Tamil Tigers, like Hamas, like Hezbollah. As we pointed out in our supplemental brief, particularly our second supplemental brief, and I urge the court to just glance at it. It is short. These are organizations that they're complex. They're not like al Qaeda. They're not just terrorists. They run kindergartens. They run orphanages. Why do they do this? Why does Hamas run kindergartens? One reason is to recruit terrorist suicide bombers when they are children to start the recruitment process. So what justifies leaving the PLO off the list? As of now, the Secretary of State has not made any determination that the PLO is engaged in terrorism. Does anybody doubt that the PLO is a terrorist organization? I mean, they do other things or pretend to anyway. Your Honor, obviously I don't. But it's a political decision. It is in part, yes. I don't want to obviously. You don't know. I'm sure the Secretary hasn't confided in you as to why she, I guess this was. He. Now it's he. And obviously I don't want to. But the decision was made by the. These designations were made by, right, Ashish, Secretary Albright. But obviously. You don't know why specifically these designations were made and others were omitted. I actually am involved often in the process in consulting the State Department. But obviously I don't want to make any kind of public comments about the PLO. The Secretary of State has been entrusted by Congress with making the determination. Are they foreign? Do they engage in terrorism? And does the terrorism against the national security of the United States, the security of U.S. nationalists. But to get to the hypothetical, to continue that, that was the Judge Bakunin, Judge Kaczynski raised earlier. Let's take pure humanitarian aid. Let's take the Red Cross comes in and assist people that have been involved in skirmishes. Under that definition, people, if that organization could be or its members, conceivably come under the umbrella of material support. If it was a foreign organization, yes, Your Honor. And I'll give you the reason why. Again, remember this is based on an explicit congressional finding. Senator Feinstein's statement on the floor of the Senate is very relevant here. Let's look at, again, at a group like Hamas or the Tamil Tigers. These are groups, they are complicated. They clearly do things that we all might say are wonderful. They help people. They patch people up. They cure children's diseases. They run schools, et cetera. They do so, though, and this is what Congress found, as part of a unified program. The program includes assassinating the president of Sri Lanka. The program includes setting off truck bombs, blowing up and killing more than 100 people at a time. Again, this isn't like Al-Qaeda. This is part of a big program. And when they do provide that kind of aid in the community, one of the things that it does is it gives the group much more credibility and popularity within the community, and that's why Congress said we're going to draw very broad lines. Mr. Lutter, I'd like to follow up on Judge Thomas's question with another one. I was somewhat surprised by your answer, maybe because I have a different understanding of what the Red Cross does. If an entity like the Red Cross went in to help individuals, regardless of their affiliation with an entity, anyone who is killed in this region or, you know, will clean up the bodies, or anybody who's injured will try to get them medical care but not particularly attached to an organization, is that made unlawful by this or not? No, Judge Graber, thank you very much for clearing that up. I misunderstood Judge Thomas's question. I'm sorry. I thought he meant if the Red Cross were a foreign terrorist organization. No, you're exactly right. No, I was not suggesting that. I misunderstood. I apologize. I'm glad we got that straight. Your Honor, that's correct. What we're talking about is if the Red Cross decided to give money to Hamas that runs a hospital, that would be different. If they came in and started treating people under Hamas's direction, just humanitarian aid, going in and saying, okay, there's been a battle, there's been a skirmish, we're going in under our Red Cross flag, I think they fall under the definition, your definition of providing material aid. Can't they enter the new statute? I mean, there's an exception where you can ask the Secretary of State to do something and get permission, correct? Yes. I'd like to answer Judge Thomas and then answer you, Judge Callahan. Yes, Judge Thomas, because I think your hypothetical had what for me was a very critical word. You said under Hamas's direction. Right. And that is the case. Obviously, if you're going to go to a foreign compound where it's a military operation, you have to say, may I come in? May I render aid? And usually it says, well, sure. So if it's under Hamas's direction or if it's giving aid to Hamas, then yes. Judge Callahan, yes. The new bill provides that somebody can make a request to the Secretary of State and it can be then authorized for certain situations. Let me ask you. It looked like there was an earthquake in one of these places, but people in a particular group who were on the list were people that were injured. They could, the Red Cross could ask permission from the Secretary of State and the Attorney General to go in and do that, correct? That's exactly right, Your Honor. Yes. But let me ask you about the specific issue that came before the district court and this Court on Appeal, and in particular the issue of training. Yes. Because training, even under the new statute, which tells you that training is instruction or teaching designed to import a specific skill as opposed to general knowledge, you say the challenge is one of overbreadth. They say it's one of vagueness. So we'll sort that out. Yes. But how does one know when you cross the line from specific skill to general knowledge? So, for example, if an organization here in the United States were to teach English, would that be a specific skill or would that be general knowledge? Your Honor, I think in the main that would be a specific skill. The reason that the – And how would one know that that was a specific skill instead of general knowledge? Your Honor, because what you would have to do is attempt to make these English words in the statute apply to real-life situations. And I understand there are difficult lines that might have to be drawn here and there. But that ties in with what – remember what this Court – How about geography? You're teaching grade school children geography. Specific skill or general knowledge? That seems much more, to me at least, to be general knowledge. Okay. And what if we teach specific geography about locations of terrorist groups and other sort of geopolitical geography? Specific skill or general knowledge? Specific skill, Your Honor. So you're going to slice and dice it basically down to the Dewey Decimal System and that's what somebody trying to figure out whether they're going to be prosecuted under the statute would have to do? Your Honor, what I'd like to do is quote very briefly from the Supreme Court's decision in Colorado v. Hill. There are two decisions that we think are directly applicable to this vagueness challenge and I think go directly to your very difficult questions to me, Your Honor. The Supreme Court said, and I'll just quote as briefly as I can, and while there is little doubt that imagination can conjure up hypothetical cases in which the meanings of these terms will be in nice question, because we are condemned to the use of words, we can never expect mathematical certainty from our language. And here then the Court said that it will not accept facial attacks when the statute is surely valid in the vast majority of its intended applications. Well, let's turn specifically to this case, though, because what at least the plaintiffs want to do with the LTTE is to develop agriculture, forestry, fishing, industries, and conducting environmental surveys. How do you categorize that under the new statute? If they're doing so to train, if that's all they want to do, then that's obviously not covered by the statute. They want to train farmers. They want to train foresters. They want to train people how to fish. They want to conduct environmental surveys. Sounds like piece of work activity to me. Perfectly valid. Obviously, if instead, and this is the key, what they want to do is train the Tamil Tigers in how to do things. That's different. I'm sorry. I thought when you said people, I'm sorry. Yes. If what they want to do is train the Tamil Tigers in... To fish, to do agriculture, to do any of those things. Yes. What you're saying is you can provide the trainers to the people of Sri Lanka or to the farmers or fishermen or whatever in a particular area of Sri Lanka, but if you provide your trainers to the Tamil Tigers organization and the Tamil Tigers organization then assigns the trainers to whom it chooses, then you've violated the law. That's exactly right, Judge Feinfeld. Well, why doesn't the law just say you can't do anything vis-à-vis a terrorist organization? Then we'd know what the law says. That's correct. That would be easy. It doesn't say that. The problem is that it has a list of about 20 things you can't do. And, Your Honor... The problem is that we have to, the person who's being prosecuted under this has to be able to know what you can and can't do. Right. But not for every hypothetical. No. And that's where, again, one more quote. If the Court will just bear, give me patience for just one second. The Harrod... What case are you quoting? I'm now going to quote United States v. Harris, which is also heavily right on our brief. 347 U.S. at page 618. The general class of offenses to which the statute is directed is plainly within its terms. The statute will not be struck down as vague, even though marginal cases could be put where doubts might arise. First Amendment case? Yes, Harris was a lobbying practice, Your Honor, and yes. So the, on training, we believe that the Court, the panel erred by saying that the statute was vague, as opposed to that it was over, I think it really is an over breadth challenge is what Professor Cole is raising. Counsel, I just have to ask you a question. Which statute are we supposed to be construing at this point? Has the new bill been signed by the President? And should we, have you asked us to take judicial notice of that one and, you know, construe that because that would be a different set of issues? Your Honor, that's, excuse me, that's a very good question, Your Honor. We called your attention to a 28-J letter that Congress had passed this bill. I have not received word that the President has signed it. As you know, he has 10 days. Until he signs it, obviously, we don't have a new statute. If the President signs the new statute, the new statute would clearly be what's before the Court because Professor Cole's clients have said that they have not been engaging in prohibited activity. They want to start up again doing the things they were doing before. So obviously, by their own allegations, they would no longer be covered by the old statute. So it would only be the assuming that the President signs it, the new statute with the new limiting definition. The record isn't really developed on that, is it? I'm sorry. Well, it's related to the basically the same. What is it that we have to decide? Your Honor, you have to decide if the injunction that the plaintiffs have sought and that the district court gave should remain in effect. This Court — Under what law? We believe it would be under the new statute because, as I say, we're taking the complaint itself. If the plaintiffs said, we've been doing this training, then you might have to worry about the old statute because the old statute could apply to prior conduct. The injunction was granted on the old statute, correct? That is correct, Your Honor. And so we have a developed record on that. And that's gone through Humanitarian 1, 2, and 3 or whatever. Right. Now, you have a new statute that wasn't before the district court. So why wouldn't it be mooted out and you vacate that injunction and then go back to the district court to develop a record on the new statute? Your Honor, again, it's a very good question. You have a couple of options as a court. That's one thing you could do. You could vacate this injunction and send it back to the district court. Again, this is all assuming the President signs the new legislation. You could do that, and that would be perfectly valid for the court to do. On the other hand, it seems to me because Professor Cole's clients have made a broad-based constitutional challenge. Now, they have argued that the limiting definitions that Congress has proposed, has now put in the bill, are the very ones that we've been proposing from the beginning of this litigation. And Professor Cole has said those, even as limited, are unconstitutionally vague and overbroad. So is it not, Your Honor, but is it your position that the amendments that pertain to this case are substantive or clarifying? Clarifying, Your Honor. And that's what we provided to you, the statement by Senator Kyle, who said we're clarifying. Yes. And if they are clarifying, then theoretically this would have retroactive effect as to the construction of the statute. That's exactly right, Your Honor. That's precisely correct. Mr. Lutter, you started off by saying you wanted the judgment affirmed in part and reversed in part. Could you be precise as to what you want affirmed and what you want reversed? Certainly, Your Honor. I'm sorry for being unclear. We want the affirmance of the part of the district court decision that denies, that rejected the argument made by the plaintiffs that the statute is valid only if a specific intent requirement is read in. We only seek reversal of the part of the injunction that says that training and personnel are unconstitutionally vague as applied to these organizations. With the HOP2 panel's definition of mens rea, do you see any difference between that and what Congress has done in the amended statute? A very minor difference, Your Honor. As we pointed out in our rehearing petition and in our supplemental briefing, on the knowledge point, we agreed with the HOP panel on which you sat on almost everything on this point. The one problem we had was that panel said knowledge means either that knowing that it is designated, which these plaintiffs do know, or the reasons for the designation. And we said we thought there had probably been a minor error there because ---- Yes. I think we took your point on that. Fine. So our disagreement with the panel on that point is probably nil. And Congress has now, it seems to me, adopted very close to what the panel said. I mean, unless I'm mistaken, you've never argued that this is a strict liability statute. Right. That is exactly correct, Your Honor. Last time when I was here arguing before the panel, there were questions about this. I might not have been as clear as I should have been. But, no, we have never argued strict liability at all. And if I mistakenly said that, it was purely a mistake. Well, I'm not sure what strict liability means in this context. You are taking the position that notice in the Federal Register is not sufficient. People actually need to have actual awareness. Actual awareness of the designation or of the, if Your Honor will give me a second, what the statutory definition of knowledge. I'm sorry, Your Honor. I thought I had it marked. Isn't it something to the effect that they're engaging in terrorist activities? Yes. It's very similar to that. I was hoping to give you the exact language. It's what I sent to you. So, Your Honor. So, in other words, giving money to the PLO would be no good either because although they're not listed, people know they're listed, they engage in terrorist activities. Oh, no, I'm sorry, Your Honor. It means, remember, the statute doesn't even apply if the organization is not designated. So giving money to the PLO is not a violation of this statute. No, that is not. So it has to be listed plus you have to have the guilty state of mind. That's correct. You either have to have knowledge that the organization is listed, and, again, that's all these plaintiffs have standing to raise here since they do know that's in their complaint. Why isn't listing in the Federal Register enough to give notice, as in the Federal Copy of the Sheldon v. Merrill? I guess that's the case, just as Bob loves to cite. Your Honor, it might have been enough, but Congress has now, in internal discussions, we had concerns about this is all now virtually mooted because of what Congress has done, but I'd like to answer your question anyway because I know you're interested in this. Suppose somebody comes to your door and says, I'm collecting money for the wonderful organization to reform Columbia. And you say, sounds terrific, here's $50. You don't happen to know that among the many aliases of the shining path, which you may have heard of, is the wonderful organization to reform Columbia. So you give money, even though it's been in the Federal Register that the wonderful organization to reform Columbia has been designated by the Secretary of State. We wanted to take care of that kind of situation and knock that out. So it has to be either knowledge of the designation or knowledge on your part that the organization engages in the type of things to get on the list. I'm sorry, Your Honor. Does anyone else have any questions for Mr. Cole? Well, just one. I gather your position then has evolved. I'm sorry? Your position has evolved. I'm sorry. Excuse me, Your Honor. Who are we? I was going to address the government, but I know that you're asking for additional questions on that. I understand your position. No, I was asking for Mr. Cole, if anybody had any questions of Mr. Cole. Because I would like to ask simply what you think, given the passage of this statute and the state of this record and the judgment below, what you think we have to decide here. All right. Well, if the President signs it into law, which I assume he will, then I think you do have the option of either remanding or of deciding the case. We are seeking prospective relief. It's our view, and we asked for supplemental briefing on this, but our view is that the definitions of training and personnel, which have now been added into the statute, do not in fact cure the problems, because all of the conduct that this Court in its prior decisions identified. That hasn't been briefed. In the context of this new statute, that has not been briefed. We've sought supplemental briefing. But my point is simply that the writing in op-ed, providing training in international law, all of the examples that this Court registered concern with respect to the prior definition would still be prohibited or at least unclear whether they're prohibited under the definition. But if you were to affirm across the board, let's say, not this one, but let's say were to affirm, you would not be precluded from going back to district court and asking for modification of the injunction in light of the new statute. I'm just asking a procedural question. Let's say this case is affirmed and becomes final. Law changes. You can go back and ask the district court. Sure. But I think if the law changes while the case is pending, I think the general rule is that you would apply it. May I have one just quick question? Is it your view that these amendments, as they pertain to this case, are substantive or clarifying? We don't have a view on that, Your Honor. And we are not challenging in any way retroactivity of retrospective nature of this law. So we're only challenging prospective. Thank you. But if I could just say one word in rebuttal to the government's argument with respect to the power to designate political organizations, foreign political organizations, the notion that because it's foreign affairs, the government has free reign to criminally prohibit all support of any organization without any showing that it engaged in any kind of illegal activity is inconsistent with the basic principles of the First Amendment. What about the Katzenbach case that the government cited? You mean Kleindienst v. Mandel? Kleindienst. Yes, Kleindienst. He was one of those guys. One of those K guys. K. Kaczynski, Kleindienst, Katzenbach. Who? Feinfeld. Who can judge? You know, that case is very easily distinguishable. It has been held to apply only in the context of the plenary power with respect to controlling who comes in and out of the country for immigration purposes. It has never been applied, for example, to the legion of cases striking down Congress's target, the Communist Party, again, a foreign-dominated organization which had been found, unlike Arklines, to have engaged in terrorism, espionage, sabotage, and the like, to overthrow the United States by force of violence. Thank you, Counselor. Your time has more than expired. I helped you use it, but it has expired. The matter just argued is submitted for decision, and the Court stands adjourned.
judges: Hearing Panel: Pregerson, Thomas, Rawlinsonen Banc Panel: Kozinski, Schroeder, Kleinfeld, Thomas, Graber, McKeown, Wardlaw, Gould, Tallman, Callahan, Bea